Mark E. Merin (State Bar No. 043849)
Paul H. Masuhara (State Bar No. 289805)
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:   (916) 443-6911
Facsimile:    (916) 447-8336
E-Mail:         mark@markmerin.com
                     paul@markmerin.com

Attorneys for Plaintiffs
DANIEL GARZA, JOSHUA RUIZ,
ELISABETH CROUCHLEY, STEVEN PASSAL,
RUSSELL VREELAND, ANTHONY PIRES,
JOHN RUFFNER, and JENNIFER LORET DE MOLA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| DANIEL GARZA, JOSHUA RUIZ, ELISABETH CROUCHLEY, STEVEN PASSAL, RUSSELL VREELAND, ANTHONY PIRES, JOHN RUFFNER, and JENNIFER LORET DE MOLA, on behalf of themselves and a class of similarly situated persons,<br><br>　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>CITY OF SACRAMENTO, SACRAMENTO POLICE DEPARTMENT, DANIEL HAHN, and DOE 1 to 225,<br><br>　　　　　　　　　Defendants. | Case No. 2:20-cv-01229-WBS-JDP<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:　　　　June 13, 2022<br>Time:　　　　1:30 p.m.<br>Location:　　Robert T. Matsui U.S. Courthouse<br>　　　　　　　501 I Street<br>　　　　　　　Sacramento, CA 95814<br>Courtroom:　5 (14th Floor)<br>District Judge:　Hon. William B. Shubb |

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................................1

II. STATEMENT OF RELEVANT FACTS & PROCEEDINGS ...............................................1

   A.  THE PLAINTIFFS........................................................................................................1

      1.  Daniel Garza ........................................................................................................1

      2.  Joshua Ruiz ..........................................................................................................2

      3.  Elisabeth Crouchley ............................................................................................2

      4.  Steven Passal........................................................................................................3

      5.  Russell Vreeland .................................................................................................4

      6.  John Ruffner........................................................................................................4

      7.  Jennifer Loret de Mola .......................................................................................5

   B.  THE DEPARTMENT'S POLICY ................................................................................5

   C.  THE DEPARTMENT'S RESPONSE ..........................................................................6

   D.  THE LITIGATION .......................................................................................................6

III. PROPOSED CLASS TO BE CERTIFIED.............................................................................6

IV. ARGUMENT ............................................................................................................................7

   A.  FED. R. CIV. P. 23(A).....................................................................................................7

      1.  Numerosity..........................................................................................................7

      2.  Commonality.......................................................................................................8

      3.  Typicality ............................................................................................................9

      4.  Adequacy of Representation .............................................................................9

   B.  FED. R. CIV. P. 23(B) ...................................................................................................10

      1.  Predominance...................................................................................................10

      2.  Superiority........................................................................................................12

V.  CONCLUSION.......................................................................................................................13

i

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP

# TABLE OF AUTHORITIES

CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................................................10

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .........................................................................8

*Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D. Cal. 1994).........................7

*Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589 (E.D. Cal. 1999) ....................................13

*Berg v. County of Los Angeles*, 2021 U.S. Dist. LEXIS 195521 (C.D. Cal. May 28, 2021).......11

*Coburn v. City of Sacramento*, 2020 U.S. Dist. LEXIS 238878 (E.D. Cal. Dec. 17, 2020)..........9, 10, 11

*General Tel. Co. v. EEOC*, 446 U.S. 318 (1980)............................................................................7

*Hagen v. City of Winnemucca*, 108 F.R.D. 61 (D. Nev. 1985)......................................................6

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ....................................................8, 9, 10

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992).........................................................9

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964) ...................................7

*Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019) .....................................................11

*Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258 (S.D. Cal. 1988)...............................................7

*Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) .............................1

*Jordan v. County of Los Angeles*, 669 F.2d 1311 (9th Cir. 1992) ..............................................7, 8

*Kincaid v. City of Fresno*, 244 F.R.D. 597 (E.D. Cal. 2007).................................................. 8, 13

*Lehr v. City of Sacramento*, 259 F.R.D. 479 (E.D. Cal. 2009) .........................................8, 10, 12

*Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748 (N.D. Cal. 2020) ......................................12

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005)............................................................11

*Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036 (9th Cir. 2012) ..................................9

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D. Cal. 2007). 9, 11, 13

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ..............................................................................8

*Schilling v. Transcor Am., LLC*, 2010 U.S. Dist. LEXIS 20786 (N.D. Cal. Feb. 16, 2010) .......12

*Scott v. Cal. Forensic Med. Grp.*, 2020 U.S. Dist. LEXIS 259154 (C.D. Cal. Sep. 30, 2020) ........9, 10, 11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................................................8

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 1991) .........................................12

ii

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP

## Rules

Fed. R. Civ. P. 23(a) ...........................................................................................................7

Fed. R. Civ. P. 23(a)(1) ........................................................................................................7

Fed. R. Civ. P. 23(a)(2) ........................................................................................................8

Fed. R. Civ. P. 23(a)(3) ........................................................................................................9

Fed. R. Civ. P. 23(a)(4) ........................................................................................................9

Fed. R. Civ. P. 23(b)(3) ..................................................................................................10, 12

iii

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP

## I. INTRODUCTION

Plaintiffs are persons present during demonstrations following the murder of George Floyd in May 2020 who were shot by police firing "less lethal" projectiles, without justification. Now, Plaintiffs move for class certification and an order directing the issuance and delivery of notices to class members.

## II. STATEMENT OF RELEVANT FACTS & PROCEEDINGS

"On May 25, 2020, George Floyd was killed by a Minneapolis police officer while being arrested. Bystanders on the sidewalk recorded videos of a police officer kneeling on Floyd's neck for several minutes while Floyd begged for his life. A video showing the last minutes of Floyd's life was circulated nationwide, and it ignited protests across the country in support of the Black Lives Matter movement." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 821 (9th Cir. 2020). This case arises out of the demonstrations occurring in Sacramento, California.

### A. THE PLAINTIFFS

#### 1. Daniel Garza

Daniel Garza was a legal observer for the National Lawyers Guild ("NLG"). (Declaration of Mark E. Merin ("Merin Decl.") Exhibit ("Ex.") A at 13–18.) On May 31, 2020, Garza attended a protest in downtown Sacramento as a legal observer. (*Id*. at 23–24.) Garza was wearing a florescent green hat with the words "National Lawyers Guild Legal Observer" and a green T-shirt. (*Id*. at 27.) Garza moved with a crowd of protestors away from the Sacramento County Main Jail towards K Street. (*Id*. at 28–32.) There was a Sacramento Police Department ("SPD") police line on K Street. (*Id*. at 32.) Garza went to the police line in attempt to document officer names and badge numbers but the SPD officers were not wearing name badges. (*Id*. at 32–35.) Then, Garza followed the crowd towards J Street. (*Id*. at 35–37.) Garza observed officers when the crowd was near 20th and J Streets. (*Id*. at 38–39.) The officers formed a police line using bikes. (*Id*. at 39–40.) Approximately 15-to-20 protestors were present near the police line, when officers began firing pepper-balls and releasing gas. (*Id*. at 40–41.) The protestors moved towards 21st and J Streets. (*Id*. at 41–42.) Garza was directed by officers to move from behind the police line to the front of the police line, which was being formed in front of Garza. (*Id*. at 42–46.) Garza wore a gasmask which protected him from the teargas being dispensed, with his legal observer hat on top. (*Id*. at 46–48.) Garza observed protestors being struck by pepperballs and beanbag rounds and dragged out the

1

street. (*Id.* at 47.) Garza assisted an injured person who had been struck in the head with a beanbag round. (*Id.* at 47–48.) Garza observed that someone behind him threw a plastic water bottle behind the police line, causing an SPD officer to fire his rifle in Garza's direction. (*Id.* at 59–61.) Garza was struck on the left side of his forehead with a beanbag round fired by an SPD officer, causing Garza to fall to the ground. (*Id.* at 51–53.) Garza observed blood from his head where he was shot. (*Id.* at 55.) Garza received medical attention from medics, who washed his wound with water and applied a bandage. (*Id.* at 64–65.) Officer fired on Garza and the medics who assist him. (*Id.* at 65.) Garza moved from his location and was provided with a ride to the hospital. (*Id.* at 66.) Garza experienced, and continues to experience, severe cognitive injuries associated with his injury. (*Id.* at 66–81.)

### 2.     Joshua Ruiz

On May 31, 2020, Joshua Ruiz attended a protest in downtown Sacramento. (Merin Decl. Ex. B at 11–12.) Ruiz attended the protests as an observer but not as a participant. (*Id.* at 12–18.) Ruiz was part of a crowd present near the State Capitol Building. (*Id.* at 18–19, 26–29.) Police lines began to form in the area, and tear gas was released and projectiles were shot into a crowd of about 40-to-50 people. (*Id.* at 19.) Ruiz observed persons being struck by projectiles, as they ran away. (*Id.* at 20.) Officers were firing projectiles at persons from police lines. (*Id.* at 21–22.) Ruiz was struck on the hip with a projectile fired by an officer. (*Id.* at 20, 23.) Ruiz began to move away from the police line, after being struck with a projectile. (*Id.* at 24.) Ruiz continued to be struck by additional projectiles, perhaps more than 20 times, as he moved away from the police line. (*Id.* at 24–26.) Ruiz was struck all over his body, including on the chest, side, back of his legs, and back of his shoulders. (*Id.* at 26.) Ruiz was struck on his side with a projectile, injuring his liver, and causing him to fall to the ground and struggle to breathe. (*Id.* at 29.) Ruiz continued to be struck by projectiles, after falling to the ground. (*Id.* at 29–31.) Ruiz tried to get up and move away but he fell to the ground again. (*Id.* at 31–32.) A group of persons came to Ruiz's aid and gave him a ride to the hospital. (*Id.* at 32–37.) Ruiz remained at the hospital for approximately four-to-five days, where it was discovered that that his liver was bleeding. (*Id.* at 38–39, 44–46.)

### 3.     Elisabeth Crouchley

On May 31, 2020, Elisabeth Crouchley attended a protest in downtown Sacramento. (Merin Decl. Ex. C at 10–15.) Crouchley was struck with a projectile while on J Street, approximately 10-to-15 feet

2

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP

from the police line. (*Id*. at 11, 15.) Crouchley dropped her phone and bent over and reached to the ground to pick it up. (*Id*. at 16.) Crouchley was shot with a projectile on her buttocks, as she was bent over and reaching for her phone. (*Id*. at 16–17.) Crouchley "buckled" in response to being shot, and then was shot a second time on the back of the neck, seconds after the first shot. (*Id*. at 17.) Crouchley fell to the ground and convulsed for approximately 30 second before persons came to her aid. (*Id*. at 17–18.) Crouchley gathered herself and attempted to walk-it-off and if carry on protesting. (*Id*. at 18–22.) Approximately 30 minutes later, Crouchley was shot with four more projectiles, blocks from the first incident. (*Id*. at 22–23.) Officers raised their firearms and started shooting into the crowd. (*Id*. at 23–25.) Crouchley put her hands in the air, ran away from the officers, and yelled "Don't shoot!" (*Id*.) Crouchley was shot four times from behind, as she ran away from the officers. (*Id*.) Crouchley was struck on the hip, foot, arm, and the back of her head. (*Id*. at 26.) Crouchley his behind a vehicle and the officers continued to shoot at her, striking the vehicle, for approximately 10-to-15 seconds. (*Id*. at 26–27.) Crouchley ran away and the officers continued to shot at her. (*Id*. at 27–30.) Crouchley noticed that she was bleeding from the back of her head, when she reached a safe location. (*Id*. at 30–31.) Crouchley was taken to the hospital, where she received two staples to close the wound on the back of her head. (*Id*. at 31–33.)

**4.     Steven Passal**

Near the midnight hour of May 30, 2020, into the early hour of May 31, 2020, Steven Passal heard commotion outside of his house, learned of protests near his neighborhood, and walked down 23rd Street towards J Street in downtown Sacramento. (Merin Decl. Ex. D at 10–11.) Passal stood on the sidewalk on 21st and J Streets. (*Id*. at 11.) Passal observed approximately 50-to-100 officers in a police line, and approximately 20-to-40 demonstrators dancing to music. (*Id*.) Passal observed one officer who "kept stepping over the police line and shooting a pepper gun -- pepper rounds, and he just kept firing it and firing it into the crowd." (*Id*. at 36.) Passal heard the word "bandoliers," and then heard shots being fired. (*Id*. at 11–12.) Passal observed a flash-bang go off above his head, causing him to turn and to run away. (*Id*. at 12–13, 23–24.) Passal was struck four times by projectiles, approximately five feet from where he started to run away. (*Id*. at 13.) Passal was struck on the tailbone, the back of his arm, the top of his head, and the back of the head. (*Id*. at 13–14.) Passal took cover near a parking lot, after being shot.

3

(*Id.* at 14–15.) Two officers on bicycles were near Passal's location in the parking lot. (*Id.* at 15.) Passal told the officers, "You shot me." (*Id.* at 15–16.) In response, the officers "just smiled." (*Id.*) Passal observed that there were people all around him being shot. (*Id.* at 16–17, 23–24.) Passal made his way back home and iced his wounds. (*Id.* at 18–20.) Passal discovered the extent of his injuries, when he returned home. (*Id.* at 20–26.)

### 5. Russell Vreeland

On May 31, 2020, Russell Vreeland attended a protest in downtown Sacramento. (Merin Decl. Ex. E at 10.) Vreeland was present as an observer. (*Id.*) Vreeland was near the police line on 20th and K Streets. (*Id.* at 16–17.) Vreeland observed officers firing projectiles at persons in front of the police line. (*Id.* at 19–20.) Vreeland observed people running away from the police and being shot in the back. (*Id.* at 20.) Vreeland observed a person collapse to the ground near a cloud of teargas, and Vreeland and others attempted to pull the injured person to safety. (*Id.* at 21.) Police fired on Vreeland and others, when they attempted to help the injured person. (*Id.* at 21–22.) Vreeland was struck by a projectile as he ran towards a teargas cannister. (*Id.* at 23–24.) Vreeland was struck with a projectile on the lower left side of his abdomen. (*Id.* at 25.) Vreeland ran away and returned home, after being struck. (*Id.* at 26–28.) Vreeland discovered that he was bleeding from his wound, when he returned home. (*Id.* at 29–31.) Vreeland sought medical attention for his injury at urgent care. (*Id.* at 32.)

### 6. John Ruffner

In the later hours of May 30, 2020, or the early hours of May 31, 2020, John Ruffner was on J Street near 15th Street in downtown Sacramento. (Merin Decl. Ex. F at 13–14.) Ruffner conversed with a few officers. (*Id.* at 14–17.) Officers were pushing and directing the protests down streets. (*Id.* at 17–19.) Ruffner noticed the officers becoming aggressive. (*Id.* at 20–21.) The officers began shooting persons, and Ruffner tried to help by washing-off pepper spray. (*Id.* at 21–22.) Ruffner was approximately 20-to-30 feet from the police line, and the crowd was being pushed by police, when Ruffner noticed a man had fallen to the ground. (*Id.* at 22–23.) Officers were shooting the man, as he was defenseless on the ground. (*Id.* at 23, 26–27.) Ruffner identified himself as non-threatening to the officers by lowering his mask, raising both hands, and walking towards the man on the ground, while stating: "I am going to get him. Don't shoot." (*Id.* at 23–24.) The officers did not intervene or issue orders to Ruffner, as he approached

4

the man. (*Id*. at 24.) When Ruffner reached the man's location, the officers opened fire on the crowd, and Ruffner was shot in the side with a projectile. (*Id*. at 24, 29–30.) Ruffner fell to the ground. (*Id*. at 24–25, 27–30.) Ruffner was then shot with a projectile in the back. (*Id*. at 24–25, 30–32.) Persons came and dragged Ruffner and the man to safety. (*Id*. at 32–34.) Ruffner believed the officers were shooting at them "for fun," and observed one officer leave the police line to roam around in the crowd shooting people "point blank" while fellow officers called for him to return to the police line. (*Id*. at 39–41.) Ruffner sought medical attention from a friend who was a doctor, due to limited financial resources. (*Id*. at 42–43.)

### 7. Jennifer Loret de Mola

In later hours of May 30, 2020, or the early hours of May 31, 2020, Jennifer Loret de Mola attended a protest in downtown Sacramento with John Ruffner. (Merin Decl. Ex. G at 13–14.) Loret de Mola and Ruffner were near J Street and "pushed" or forced to move several blocks by officers using bikes as a barrier. (*Id*. at 14–17.) Loret de Mola was approximately six-to-10 feet away from the police line, while holding her hands up. (*Id*. at 17.) Loret de Mola attended the protest on behalf of an unorganized group, "Mothers," which planned to stand in front of the police line to show that nonviolent protests works. (*Id*. at 35.) Loret de Mola was ordered by an officer to "Put your mask on." (*Id*. at 17.) Loret de Mola had not noticed that her mask had fallen down her face. (*Id*. at 17–18.) Loret de Mola lifted her mask over her nose, and responded to the officer: "I'm sorry. I usually wear it." (*Id*.) Thereafter, Loret de Mola was shot in the chest by an officer. (*Id*.) Loret de Mola was standing still, with her hands raised, as she was shot. (*Id*. at 17–18.) Loret de Mola was struck in the ribs, knocking her back several feet. (*Id*. at 18–20.) Loret de Mola sustained a large, swollen contusion and experienced trouble breathing. (*Id*. at 19, 25–27.) Loret de Mola arranged to be picked-up, while Ruffner stayed at the scene to help someone who had been shot in the head. (*Id*. at 21–23.) Loret de Mola sought medical treatment for her injuries. (*Id*. at 23–24.)

### B.   THE DEPARTMENT'S POLICY

At the time of the demonstrations giving rise to this case, Sacramento Police Department ("SPD") maintained a "Crowd and Riot Control Manual." (Merin Decl. Ex. H.) Therein, the manual states: "General Order 532.11, implements this manual and requires personnel know its contents and follow its

5

guidelines when handling crowd and riot situations." (*Id*. at 3.) But there is no "General Order 532.11." (*Id*. Ex. I at 24–27.)

Based on this deficiency, an expert has opined that "the lack of an adequate policy regarding the use of these powerful weapons, lack of training as to how (if at all), to use impact weapons in relation to a protest or demonstration, as well as a failure to prepare formal rules of engagement regarding the use of weapons at the event, likely contributed to the officers' improper use of impact munitions in this incident." (*Id*. Ex. J at 37, 39–40.)

**C.   THE DEPARTMENT'S RESPONSE**

Eight citizen complaints were filed with SPD which alleged improper use-of-force occurring on May 30, 2020, to May 31, 2020. (Merin Decl. Ex. K, L, M, N, O, P Q, R.) No complaint was sustained by SPD. (*See id*.) Then-SPD Chief Hahn does not know if any of his officers were disciplined, as a result of any use of force during the protests. (*Id*. Ex. S at 47–49.) Chief Hahn received notice that thousands attended the demonstrations. (*Id*. Ex. T.)

**D.   THE LITIGATION**

On June 18, 2020, this action was initiated with the filing of the Complaint. (ECF No. 1.)

On August 14, 2020, Plaintiffs Daniel Garza, Joshua Ruiz, Elisabeth Crouchley, Steve Passal, Russell Vreeland, Anthony Pires, John Ruffner, and Jennifer Loret de Mola (collectively, "Plaintiffs") filed the currently-operative First Amended Complaint. (ECF No. 4.)

On September 10, 2020, Defendants City of Sacramento, Sacramento Police Department, and Daniel Hahn (collectively, "Defendants") filed the currently-operative First Amended Answer to the First Amended Complaint. (ECF No. 7.)

### III.   PROPOSED CLASS TO BE CERTIFIED

Plaintiffs seek certification of a class defined as follows:[1]

> All persons present on May 30, 2020, and May 31, 2020, at the demonstrations in downtown Sacramento, who were injured by less-lethal impact weapons, referred to as "beanbag rounds," "baton rounds," or "rubber bullets," fired by Sacramento Police Department's officers and/or mutual aid partners.

---

[1] A court "may construct a definition of the class, or may modify a proposed definition where the original is inadequate." *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63–64 (D. Nev. 1985) (citations omitted).

6

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP

## IV. ARGUMENT

### A. FED. R. CIV. P. 23(a)

There are four "prerequisites" for certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a).

#### 1. Numerosity

Numerosity requires a class "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility," but "only … difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (internal citation omitted). There is no definitive numerical cut-off used to determine whether a class is sufficiently numerous. Rather, courts must examine the specific facts of each case to evaluate whether the requirement has been satisfied. *See General Tel. Co. v. EEOC*, 446 U.S. 318, 329–30 (1980). Further, plaintiffs need not state the exact number of potential members nor identify all the members of the class. *See Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). "As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988); *cf. Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 & n.10 (9th Cir. 1992) (identifying eight cases where classes with fewer than 40 members were certified).

In this case, numerosity is satisfied based on the evidence of indiscriminate force used by officers against crowds of persons, exceeding the "40 or more" threshold. Officers reported firing hundreds of less lethal rounds at protesters, striking and injuring at least 100 persons. (*See* Merin Decl. ¶ 22.) Further, Plaintiffs have testified that—in addition to their own experiences—they witnessed officers firing and striking crowds of persons with projectiles, without cause. (*See id*. Ex. A at 47 ("I observed numerous people having to be dragged out of the street because they were hit with rounds."); *id*. Ex. B at 19 (describing officers "shoot[ing] off tear gas, rubber bullets, all kinds of different things" into a "crowd of about I want to say 40, 50 people…"); *id*. at 29 (describing being "in the crowd … where just all the -- suddenly the cops just started shooting at all the protesters"); *id*. Ex. D at 36 (describing an officer who "kept stepping over the police line and shooting a pepper gun -- pepper rounds, and he just kept firing it

7

and firing it into the crowd"); *id*. Ex. E at 19–20 ("[T]he police would just open fire indiscriminantly, the entire line, discharging every weapon they have. [¶] At that point, the crowd panics, retreats, and as they're running backwards, you see people falling all around you. People being shot in the back. People running away."); *id*. at 21–23 ("[W]e would be fired upon, we would run away, come back. They would fire upon us again and that continued until I was struck."); *id*. at 26 (describing "a mass firing into the crowd"); *id*. Ex. F at 21 ("Other people were getting shot, other people were getting injured…"); *id*. at 38 ("We seen her get shot, a lot of people getting shot.").)

### 2.  Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that their class claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The commonality requirement is construed liberally and the existence of some common legal and factual issues is sufficient. *See Jordan*, 669 F.2d at 1320. In fact, "plaintiffs need only point to a single issue common to the class." *Kincaid v. City of Fresno*, 244 F.R.D. 597, 602 (E.D. Cal. 2007).

"All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). In civil rights cases, commonality exists where the action challenges a "system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). "In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id*. In other words, even "where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (citation omitted).

In this case, common issues of law and fact include, for example, whether Defendants maintained a policy or custom causing indiscriminate use of force against persons present at protests and, if so, whether class members' rights were violated as a result of such customs. *See*, *e.g.*, *Lehr v. City of Sacramento*, 259 F.R.D. 479, 483 (E.D. Cal. 2009); *Scott v. Cal. Forensic Med. Grp.*, 2020 U.S. Dist.

8

LEXIS 259154, at *12–14 (C.D. Cal. Sep. 30, 2020) (collecting cases). Specifically, SPD's "command decisions to declare an unlawful assembly, disperse the crowd, and authorize the use of force constitute the 'common core of salient facts' that support commonality." *See Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 631 (C.D. Cal. 2007).

### 3. Typicality

Typicality requires a determination as to whether a plaintiff's claims are typical of those of the class members he seeks to represent. *See* Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation omitted). Commonality and typicality "tend to merge" in that both factors "serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (internal citation omitted).

In this case, "[f]or the same reasons demonstrating that commonality exists, the requirement of typicality is met." *See Coburn v. City of Sacramento*, 2020 U.S. Dist. LEXIS 238878, at *13 (E.D. Cal. Dec. 17, 2020). Plaintiffs and the class members were subject to Defendants' same policy or custom which allegedly resulted in the violation of the same rights. (*See* Merin Decl. Ex. A, B, C, D, E, F, G.) That is, "[a]ll of the proposed representatives claim they were driven from the [protest]" by use of force and "all claim physical injury." *See Multi-Ethnic Immigrant Workers*, 246 F.R.D. at 632. Further, "one's right to be free from excessive force does not depend on whether one was participating in the protest." *Id*. "Nor do differences in physical contact and injury defeat typicality as to the Fourth Amendment claim, because they are permissible variations within a class." *Id*.

### 4. Adequacy of Representation

The adequacy of representation requirement set forth in Fed. R. Civ. P. 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class

9

members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

First, there are no indications that representative Plaintiffs have any conflicts of interest with the class members, and they are sufficiently motivated vigorously to pursue the interests of the absent class members in this case. (Merin Decl. ¶ 23; Declaration of Paul H. Masuhara ("Masuhara Decl.") ¶ 2.) *See Coburn*, 2020 U.S. Dist. LEXIS 238878, at *14 ("Plaintiffs' interests appear to be aligned with those of the class; nothing in the record currently before the court suggests otherwise.").

Second, Plaintiffs' counsel are aware of no conflicts of interest, are sufficiently motivated vigorously to pursue the interests of the absent class members, and are sufficiently qualified and experienced to represent the class members. (Merin Decl. ¶ 24; Masuhara Decl. ¶ 3.) Specifically, Plaintiffs are represented by qualified and competent counsel with extensive experience and expertise prosecuting class actions, including those related to violations of constitutional rights. (Merin Decl. ¶¶ 25–46; Masuhara Decl. ¶¶ 4–19.)

**B.    FED. R. CIV. P. 23(b)**

Certification of a damages class is appropriate where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1.    Predominance**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. "Where a uniform policy or regular and recurring practices exist, the common issues predominate over the individual issues, and the class action device is superior, under the standards of Rule 23(b)(3)." *See*, *e.g.*, *Scott*, 2020 U.S. Dist. LEXIS 259154, at *12; *Lehr*, 259 F.R.D. at 483. "Courts in this Circuit and elsewhere have routinely certified … damages classes where there was a common practice, which obviously will vary more than a single

10

policy. For example, such classes have been certified where police acted against a group of demonstrators." *Scott*, 2020 U.S. Dist. LEXIS 259154, at *12. Accordingly, "[c]ommon issues predominate over individual issues in this case." *Coburn*, 2020 U.S. Dist. LEXIS 238878, at *16.

In this case, the claims are fundamentaly different than individual excessive force claims because "municipal defendants may be liable under § 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights." *See Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019). For example, the class may have "suffered a constitutional deprivation as a result of the collective inaction of the [Sacramento] Police Department, or of officers' adherence to departmental customs or practices." *Id*. (internal citations omitted). In other words, "[t]he class claims here are not the same as, or dependent upon, any individualized claim(s) that representative plaintiffs or class members might otherwise allege." *Coburn*, 2020 U.S. Dist. LEXIS 238878, at *16. This is because "[t]he elements of Plaintiffs' *Monell* claim rely on proof involving [Defendants'] policies and practices, and will not require facts individual to each class member's claims." *See Multi-Ethnic Immigrant Workers*, 246 F.R.D. at 635.

As a result, as discussed with respect to commonality, "the liability determination is the same for each proposed 23(b)(3) class member." *See Scott*, 2020 U.S. Dist. LEXIS 259154, at *14. This is especially true where "[i]t is difficult to determine the identity of the officers responsible for any particular injuries, because the officers wore riot gear that obscured their name tags and they fired munitions from various skirmish lines. . . Hence, individualized assessments of whether an officer's use of force was reasonable will not be possible for the majority of putative class members." *See Multi-Ethnic Immigrant Workers*, 246 F.R.D. at 635. Accordingly, "the common issues in the … Fourth Amendment claim, *Monell* claim, and *respondeat superior* liability are more than sufficient to meet the predominance requirement of Rule 23(b)(3)." *Id*. at 634. For example, the legality of the use of "less-lethal" impact weapons against protesting demonstrators, and the existence of a policy or custom permitting the practice. *See*, *e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1147–48 (9th Cir. 2005) (five incidents of alleged rights violations during a single demonstration could give rise to an inference that a policy or custom existed); *Berg v. County of Los Angeles*, 2021 U.S. Dist. LEXIS 195521, at *31, *43 (C.D. Cal. May 28, 2021) ("[T]he lack of evidence that any officers have been counseled or disciplined

11

for the uses of force at the [] protests in question indicates that those allegedly unreasonable uses of force were officially sanctioned."); *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020) ("[W]hen the department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates.").

### 2. Superiority

To assess the superiority of a class action, a court examines four factors, including: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3).

First, class members have a limited interest individually in bringing their own actions, as the damages arising from each constitutional violation may not be significant, or, alternatively, class members are not likely to pursue their individual claims given ignorance of their rights. *See*, *e.g.*, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 1991) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action."). "Additionally, in the instant action, the class members have the option to 'opt-out' …, thus allowing individuals the opportunity to control the litigation." *Lehr*, 259 F.R.D. at 484.

Second, Plaintiffs are not aware of "a multiplicity of suits [that] will continue through judicial proceedings." *See Lehr*, 259 F.R.D. at 484. Rather, Plaintiffs are aware of only three other individual cases by persons injured during the protests—perhaps, in manners different than Plaintiffs and class members in this case. Those cases are: **(1)** *Phansopha v. City of Sacramento*, U.S. Dist. Ct., E.D. Cal., Case No. 2:20-cv-02313-JAM-CKD; **(2)** *Coner v. City of Sacramento*, Sacramento Cnty. Super. Ct., Case No. 34-2020-00285118-CU-CR-GDS; and **(3)** *Love v. City of Sacramento*, Sacramento Cnty. Super. Ct., Case No. 34-2020-00285181-CU-CR-GDS.) Significantly, none of the three other cases is a proposed class action involving class claims, like this case. Accordingly, the presence of other actions supports a finding of superiority, rather than defeats it. *See Schilling v. Transcor Am., LLC*, 2010 U.S. Dist. LEXIS 20786, at *33–34 (N.D. Cal. Feb. 16, 2010).

12

Third, requiring individual class members separately to bring action to recover for the same class claims alleged in this action would be impractical and unduly burden courts with a multiplicity of litigation. For example, individual cases could produce duplicative results, require redundant discovery, and burden courts with the same evidence or legal issues, which otherwise can be adjudicated on a class-wide basis in this case. Accordingly, the cost of proving damages in separate trials would outweigh the potential recovery and make individual actions unfeasible. *See*, *e.g.*, *Kincaid*, 244 F.R.D. at 607.

Fourth, this case is manageable as a class action. For example, Plaintiffs can utilize class notice procedures to ascertain class membership. If necessary, "[a] number of management tools are available to addressed individualized damages issues, such as bifurcating liability and damages trials, appointing a magistrate judge or special master to preside over damages proceedings, and creating subclasses as permitted under Rule 23(c)(4)"—or "damages may be assessed class-wide based on a formula or through test trials." *See Multi-Ethnic Immigrant Workers*, 246 F.R.D. at 636. In any event, "[m]anageability is not a separate area of inquiry in considering certification under Rule 23(b)(3), but merely a secondary problem to consider…" *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 600 (E.D. Cal. 1999) (citation omitted).

## V.     CONCLUSION

For the reasons stated, Plaintiffs respectfully requests the Court:

(1)     To certify the following class, pursuant to Rule 23(b)(3): "All persons present on May 30, 2020, and May 31, 2020, at the demonstrations in downtown Sacramento, who were subject to use of force by Sacramento Police Department's officers' and/or mutual aid partners' firing of projectiles, and who did not engage in conduct justifying use of force arising from the police response to protestors."

(2)     To appoint Plaintiffs Daniel Garza, Joshua Ruiz, Elisabeth Crouchley, Steven Passal, Russell Vreeland, Anthony Pires, John Ruffner, and Jennifer Loret de Mola as representative class members, on behalf of themselves and a class of similarly situated persons;

(3)     To appoint Mark E. Merin and Paul H. Masuhara of the Law Office of Mark E. Merin as Class Counsel; and

(4)     To order the submission of a proposed Class Notice and distribution methodology, for Court consideration and approval.

13

Dated: May 9, 2022

Respectfully Submitted,

By: _____
Mark E. Merin
Paul H. Masuhara
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone: (916) 443-6911
Facsimile: (916) 447-8336

Attorneys for Plaintiffs
DANIEL GARZA, JOSHUA RUIZ,
ELISABETH CROUCHLEY, STEVEN PASSAL,
RUSSELL VREELAND, ANTHONY PIRES,
JOHN RUFFNER, and JENNIFER LORET DE MOLA

14

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
*Garza v. City of Sacramento*, United States District Court, Eastern District of California, Case No. 2:20-cv-01229-WBS-JDP