1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   DANIEL GARZA, JOSHUA RUIZ,              No. 2:20-cv-01229 WBS JDP
     ELISABETH CROUCHLEY, STEVEN
13   PASSAL, RUSSELL VREELAND,
     ANTHONY PIRES, JOHN RUFFNER, and
14   JENNIFER LORET DE MOLA, on             ORDER RE PLAINTIFFS' MOTION
     behalf of themselves and a class       FOR CLASS CERTIFICATION
15   of similarly situated persons,

16              Plaintiffs,

17        v.

18   CITY OF SACRAMENTO, SACRAMENTO
     POLICE DEPARTMENT, DANIEL HAHN,
19   and DOES 1 to 225,

20              Defendants.

21

22                          ----oo0oo----

23          Plaintiffs Daniel Garza, Joshua Ruiz, Elisabeth

24   Crouchley, Steven Passal, Russell Vreeland, Anthony Pires, John

25   Ruffner, and Jennifer Loret de Mola ("plaintiffs") brought this

26   putative class action against defendants City of Sacramento (the

27   "City"), Sacramento Police Department, Daniel Hahn, and Does 1-

28   225 (collectively, "defendants") alleging violations of

                                   1

1    constitutional, statutory, and common law rights based on

2    Sacramento police and other law enforcement officers' use of

3    "less-lethal" impact weapons against them during protests on May

4    30 and 31, 2020.  (See First Am. Compl. ("FAC") (Docket No. 4).)

5    Specifically, in the operative complaint, plaintiffs assert both

6    individual and class-wide claims for (1) excessive force under

7    the Fourth Amendment to the United States Constitution;

8    (2) excessive force under the Fourteenth Amendment to the United

9    States Constitution; (3) retaliation under the First Amendment to

10   the United States Constitution; (4) violation of equal protection

11   under the Fourteenth Amendment to the United States Constitution,

12   (5) violation of the Rehabilitation Act, 29 U.S.C. § 701, et

13   seq.; (6) violation of the Americans with Disabilities Act, 42

14   U.S.C. § 12101, et seq.; (7) excessive force under Article I,

15   Section 13 of the California Constitution; (8) excessive force

16   under Article I, Section 7(a) of the California Constitution;

17   (9) retaliation under the California Constitution; (10) violation

18   of equal protection under the California Constitution;

19   (11) violation of the Tom Bane Act, Cal. Civ. Code § 52.1;

20   (12) assault and battery; (13) intentional infliction of

21   emotional distress; and (14) negligence.  (Id. at ¶¶ 194-296.)

22           Plaintiffs now move for certification of a class

23   defined as:

24       All persons present on May 30, 2020, and May 31, 2020,
         at the demonstrations in downtown Sacramento, who were
25       injured by less-lethal impact weapons, referred to as
         "beanbag rounds," "baton rounds," or "rubber bullets,"
26       fired by Sacramento Police Department's officers
         and/or mutual aid partners.
27

28   (Mot. at 10 (Docket No. 13-1).)

                                  2

1    I.    Factual and Procedural Background[1]

2              On May 26, 2020, a white Minneapolis police officer

3    killed George Floyd, a black man, sparking nationwide protests.

4    (FAC at ¶¶ 21, 23-24.)   These included protests that occurred in

5    Sacramento on May 30 and May 31, 2020.   (Id. at ¶¶ 26-164.)

6    Plaintiffs were each present at these protests at varying times,

7    at varying locations in the city, and in varying capacities -- as

8    protesters, as legal observers, or as bystanders.   (See id.)   For

9    example, plaintiff Garza was present on May 30, acting as a legal

10   observer, and travelled from I Street and 7th Street to 21st

11   Street, and plaintiff Ruiz was present on May 31 while "attending

12   a demonstration occurring in downtown Sacramento near Capitol

13   Avenue and L street."   (Id. at ¶¶ 26-44, 79.)   Multiple

14   plaintiffs were present in "the early hours of May 31, 2020 . . .

15   in downtown Sacramento" on J street between 13th Street and 21st

16   Street, while "attending a demonstration," while "present at a

17   demonstration," while "observing a demonstration," or while

18   "present near a demonstration."   (Id. at ¶¶ 90, 103, 113, 118,

19   136, 153.)

20             At varying points while at or near the protests,

21   plaintiffs were each struck at least once by a projectile weapon

22   fired by Sacramento police officers.   Plaintiff Garza was shot by

23   Defendant Doe 2 at approximately 2100 J Street, after observing

24   that another person had thrown an object toward the police line

25   that had formed there, and was shot again by one or more of

26   Defendants Doe 1 through 25 while he was seeking medical

27   _____

28           [1]   All facts recited herein are as alleged in the First
     Amended Complaint.

1    attention in a nearby parking lot.  (<u>Id.</u> at ¶¶ 45-55, 62-70.)  He

2    sustained a concussion from having been shot in the head,

3    continues to experience pain and swelling in the part of his face

4    where he was shot, and has since experienced difficulties with

5    his memory and cognition.  (<u>Id.</u> at ¶¶ 58, 77-78)

6         Plaintiff Ruiz was shot multiple times by one or more

7    of Defendants Doe 26 through 50 near Capitol Avenue and L Street,

8    after those defendants "began indiscriminately to fire their

9    weapons into the crowd of protestors."  (<u>Id.</u> at ¶¶ 79-84.)  He

10   sustained several cuts and bruises, as well as lacerations to his

11   liver from the impact of defendants' weapons, and continues to

12   experience pain from his injuries.  (<u>Id.</u> at ¶¶ 87-88.)

13        Plaintiff Crouchley was shot six times from behind by

14   one or more of Defendants Doe 51 through 75 near 20th Street and

15   J Street.  (<u>Id.</u> at ¶¶ 90-97.)  She was struck while running away

16   from officers who had begun shooting at other protestors, with

17   her hands above her head, after she saw that others had been

18   shot.  (<u>Id.</u> at ¶¶ 93-97.)  She sustained a laceration to the back

19   of her head, requiring two staples to close the wound, as well as

20   severe bruising.  (<u>Id.</u> at ¶¶ 99, 101.)

21        Plaintiff Passal was not involved in a demonstration

22   but rather was merely observing one, near 21st Street and J

23   Street.  (<u>Id.</u> at ¶¶ 103, 106.)  While watching a standoff between

24   demonstrators and Defendants Doe 76 through 100 there, he was

25   shot three times from behind by these defendants, after they had

26   "forcibly moved demonstrators."  (<u>Id.</u> at ¶¶ 104-09.)  He has

27   since experienced headaches, back problems, and trouble sleeping.

28   (<u>Id.</u> at ¶ 111.)

4

1     Plaintiff Vreeland was shot once in the abdomen by one
2 of Defendants Doe 101 through 125 near 21st Street and J Street.
3 (Id. at ¶¶ 113-15.)  He sustained bruises, suffered a hematoma
4 lasting several weeks, and continues to experience pain, anxiety,
5 and insomnia from the experience.  (Id. at ¶¶ 116-17.)

6     Plaintiff Pires was shot multiple times by one or more
7 of Defendants Doe 126 through 150 near 13th Street and J Street,
8 while he was standing "off to the side of the demonstration" and
9 filming officers, after officers ordered demonstrators to
10 disperse and began advancing toward them.  (Id. at ¶¶ 118-32.)
11 He sustained bruises, continues to experience pain from his
12 injuries, and now experiences anxiety among crowds.  (Id. at
13 ¶¶ 134-35.)

14     Plaintiff Ruffner was shot multiple times by one or
15 more of Defendants Doe 151 through 175 near 15th Street and J
16 Street while helping a demonstrator who was being shot while on
17 the ground, after Ruffner gestured to officers to indicate he
18 intended to move the demonstrator out of harm's way.  (Id. at
19 ¶¶ 136-145.)  These defendants continued to shoot at him as other
20 demonstrators dragged him away.  (Id. at ¶ 145.)  He was
21 initially unable to walk and sustained bruising.  (Id. at ¶¶ 146-
22 47, 151.)

23     Plaintiff Loret de Mola was shot once by Defendant Doe
24 176 near 15th Street and J Street.  (Id. at ¶¶ 153, 159.)  While
25 participating in a demonstration and holding her hands up, her
26 mask fell off of her face, prompting Doe 176 to demand she put it
27 back on.  (Id. at ¶¶ 154-57.)  When she did, Doe 176 shot her
28 from approximately six feet away, causing her to sustain bruising

1  and soreness.  (Id. at ¶¶ 158-63.)

2  II.  Discussion

3          A class action is "an exception to the usual rule that
4  litigation is conducted by and on behalf of the individual named
5  parties only."  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)
6  (citation omitted).  "To come within the exception, a party
7  seeking to maintain a class action 'must affirmatively
8  demonstrate his compliance' with [Federal] Rule [of Civil
9  Procedure] 23."  Id. (quoting Wal-Mart Stores, Inc. v. Dukes, 564
10  U.S. 338, 350 (2011)).  Consequently, a class action will be
11  certified only if it meets the four prerequisites identified in
12  Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and
13  (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  If these
14  requirements are met, the action must also fit within one of the
15  three subdivisions of Rule 23(b).  See id. at 23(b).  Here,
16  plaintiffs seek certification under Rule 23(b)(3), which requires
17  both (a) "that the questions of law or fact common to class
18  members predominate over any questions affecting only individual
19  members," and (b) "that a class action is superior to other
20  available methods for fairly and efficiently adjudicating the
21  controversy."  Id. at 23(b)(3).

22          "Rule 23 does not set forth a mere pleading standard."
23  Wal-Mart Stores, 564 U.S. at 350.  "[C]ertification is proper
24  only if the trial court is satisfied, after a rigorous analysis,"
25  that the necessary prerequisites have been satisfied.  Id. at
26  350-51 (citations and internal quotation marks omitted).  The
27  court may consider the merits of plaintiffs' underlying claims
28  only to the extent they are relevant to determining whether the

1   prerequisites for class certification are satisfied.  Amgen Inc.

2   v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013)

3   (citation omitted).

4          In opposing class certification, defendants argue that

5   numerosity, predominance, and superiority are not satisfied; they

6   do not appear to challenge commonality, typicality, or adequacy

7   of representation.  (See Opp. (Docket No. 16).)

8       A.   Predominance

9          The court agrees that the predominance requirement,

10  which plaintiffs are required to establish when seeking

11  certification under Rule 23(b)(3), is not satisfied in this case.

12  "The predominance inquiry focuses on the relationship between the

13  common and individual issues and tests whether proposed classes

14  are sufficiently cohesive to warrant adjudication by

15  representation."  Senne v. Kansas City Royals Baseball Corp., 934

16  F.3d 918, 927 (9th Cir. 2019) (citation and internal quotation

17  marks omitted).  The requirement "ensures that 'common questions

18  present a significant aspect of the case' such that 'there is

19  clear justification' -- in terms of efficiency and judicial

20  economy -- for resolving those questions in a single

21  adjudication."  Romero v. Securus Techs., Inc., 331 F.R.D. 391,

22  410 (S.D. Cal. 2018) (quoting Hanlon v. Chrysler Corp., 150 F.3d

23  1011, 1022 (9th Cir. 1998)).

24         "In determining whether the predominance requirement is

25  met, courts have a 'duty to take a close look at whether common

26  questions predominate over individual ones' to ensure that

27  individual questions do not 'overwhelm questions common to the

28  class.'"  Senne, 934 F.3d at 927 (quoting Comcast Corp., 569 U.S.

7

1    at 34).  In other words, it "requires courts to ask 'whether the
2    common, aggregation-enabling issues in the case are more
3    prevalent or important than the non-common, aggregation-
4    defeating, individual issues.'"  Id. at 938 (quoting Tyson Foods,
5    Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016)).

6         Here, plaintiffs -- the proposed class representatives
7    -- note that they seek class certification only as to class-wide
8    claims alleging municipal liability against the City, rather than
9    for their individual claims alleging, inter alia, excessive force
10   and retaliation against them by individual defendant officers.
11   (See Mot. at 15; Reply at 4 (Docket No. 17); FAC at ¶¶ 196-97,
12   202-03, 208-09, 214-15, 221-22, 228-29, 234-35, 241-42, 248-49,
13   255-56, 262-69, 271-72, 278-79, 285-86, 292-93 (delineating
14   individual claims alleging violation of constitutional,
15   statutory, and common law rights, and separately asserting class-
16   wide claims alleging municipal policies caused those alleged
17   violations).)

18        Accordingly, the court evaluates whether issues
19   pertaining to the municipal liability claims that are alleged to
20   be common to all putative class members, such as the existence of
21   a municipal policy or custom that caused the alleged violations
22   of plaintiffs' and other putative class members' civil rights,
23   predominate over individual questions that must be resolved when
24   determining the existence of municipal liability.  See Senne, 934
25   F.3d at 927, 938; (Mot. at 12).  In other words, even if there
26   indeed are issues common to all putative class members, such that
27   those issues may be resolved uniformly on a class-wide basis,
28   predominance will not be satisfied if the significance and number

of those issues is substantially outweighed by the significance and number of other issues requiring individualized proof.

Because § 1983 does not provide for vicarious liability, a local government "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dept. of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694 (1978). "Liability may attach to a municipality only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Ulrich v. City & Cnty. of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002) (quoting Monell, 436 U.S. at 694).

That particular challenged acts "may be fairly said to represent official policy," thereby demonstrating the existence of a § 1983 claim for municipal liability, may be shown in multiple ways relevant to plaintiffs' claims: (1) identifying an express policy, see Monell, 436 U.S. at 690; (2) "prov[ing] the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion) (citation and internal quotation marks omitted); (3) showing that a subordinate officer's unconstitutional decision was "subject to review by the municipality's authorized policymakers" who "approve[d] [the] subordinate's decision and the basis for it," id.; and (4) demonstrating that the municipality failed to adequately

1   train employees so as to avoid the constitutional violations that
2   allegedly occurred, see City of Canton v. Harris, 489 U.S. 378,
3   388 (1989).  (See FAC at ¶¶ 165-178, 192-93, 197, 203, 209, 215,
4   222, 229, 235, 242, 249, 256, 263, 265, 267, 269, 272, 279, 286,
5   293 (alleging existence of municipal policies based on these four
6   theories).)

7         Regardless of the form a "policy" takes for purposes of
8   municipal liability, it must also be a legal cause of the injury
9   or injuries of which a plaintiff complains.  See Harris, 489 U.S.
10  at 385 (municipal liability requires "a direct causal link
11  between a municipal policy or custom and the alleged
12  constitutional deprivation"); id. at 389 ("[A] municipality can
13  be liable under § 1983 only where its policies are the 'moving
14  force behind the constitutional violation.'") (quoting Monell,
15  436 U.S. at 694) (alterations adopted); Monell, 436 U.S. at 694
16  (municipal liability exists only "when execution of a
17  government's policy or custom . . . inflicts the injury"); see
18  also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397,
19  405 (1997) ("Where a plaintiff claims that the municipality has
20  not directly inflicted an injury, but nonetheless has caused an
21  employee to do so, rigorous standards of . . . causation must be
22  applied to ensure that the municipality is not held liable solely
23  for the actions of its employee.") (citations omitted).

24        Plaintiffs contend that their class-wide claims for
25  municipal liability depend on common showings such as "the
26  legality of the use of 'less-lethal' impact weapons against
27  protesting demonstrators, and the existence of a policy or custom
28  permitting the practice."  (Mot. at 15.)  Based on these asserted

1    points of commonality, they contend that predominance is

2    satisfied because "the elements of Plaintiffs' [municipal

3    liability] claim rely on proof involving Defendants' policies and

4    practices, and will not require facts individual to each class

5    member's claims."  (Id. (citation omitted, alterations adopted).)

6         However, as explained, to establish municipal

7    liability, plaintiffs, as proposed class representatives, are

8    required not only to identify and prove the existence of a

9    challenged policy, but also to demonstrate that each class

10   member's rights were in fact violated and that the challenged

11   policy (or implementation thereof) was the cause of those

12   violations.  See Harris, 489 U.S. at 385, 389; Monell, 436 U.S.

13   at 694.  The latter inquiries are necessarily individual.

14   Assuming the existence of one or more of the challenged policies

15   were established, to determine liability the court would then be

16   required to consider what particular injury a given class member

17   suffered, whether that injury amounted to a deprivation of that

18   individual's rights, and whether the injury was actually caused

19   by one or more challenged policy and did not have some other,

20   independent cause.

21        For example, one asserted policy challenged by

22   plaintiffs allegedly "authorizes officers to use force against

23   non-threatening demonstrations," providing that "[i]f a display

24   of officers accompanied by a dispersal order does not result in

25   voluntary dispersal, more forceful action may be employed."  (FAC

26   at ¶ 167.)  However, whether such a policy was the cause of a

27   given class member's injuries would require an individualized

28   determination of the particular circumstances faced by the

1  officer who used force against that individual, including the

2  individual's conduct -- for example, whether a dispersal order

3  had in fact been given, and if so, whether the class member had

4  complied with that order.  If one class member failed to disperse

5  after an order was issued, an injury he or she subsequently

6  sustained might be attributable to the policy, whereas if a

7  second class member did disperse and was nonetheless injured,

8  such injury would not be attributable to the policy by the

9  policy's own terms, which require a failure to disperse.

10  Similarly, although plaintiffs allege the policy authorizes the

11  use of force against "non-threatening demonstrations," whether

12  the policy caused a given class member's injury would require a

13  particularized determination of whether that individual, and/or

14  other demonstrators surrounding him or her, engaged in conduct

15  that might be considered threatening.[2]

16      Plaintiffs likewise allege that the City and the

17  Department "maintain an unofficial custom whereby their officers

18  are permitted to employ unconstitutional tactics against persons

19  in or around the area of a demonstration/protest -- particularly

20  as it relates to demonstrations/protests concerning the subject

21

22      [2]   The result might be different if, for example,
   plaintiffs alleged that the City maintained a policy

23  affirmatively requiring officers to shoot less-lethal weapons
   into crowds indiscriminately whenever responding to protests.

24  The existence of such a policy would tend to negate many of the
   individualized inquiries the court has identified, since it would

25  indicate that officers shot a given class member simply because
   that individual was part of a crowd during a protest and not

26  because of any threat he or she appeared to pose to officers or
   others under the circumstances.  Here, however, plaintiffs have

27  not identified a policy that would foreclose the need for
   individualized inquiries into causation in that way.

28

1    of police violence." (FAC at ¶ 170.)  Other than establishing

2    the existence of this alleged custom, proving liability here

3    would again involve individualized considerations: Plaintiffs

4    would be required to show that unconstitutional tactics were

5    indeed employed, and each class member would be required to

6    demonstrate that they were subject to police violence because of

7    those tactics -- rather than because of other, constitutionally

8    compliant crowd control methods that may have been employed at

9    the particular protest they attended, or because of threatening

10   conduct by that particular individual.

11          As the factual allegations recited at the outset of

12   this Order show, however, the proposed class representatives were

13   present at or near protests at different times, at different

14   locations, and in different capacities.  They each appear to

15   allege that different officers caused their injuries.  (Compare

16   FAC at ¶¶ 26-69 (alleging plaintiff Garza was shot by one or more

17   of defendants Does 1 through 25), with id. at ¶¶ 79-84 (alleging

18   plaintiff Ruiz was shot by one or more of defendants Does 26

19   through 50).)  Each suffered different injuries from one another

20   under different circumstances, after engaging in different

21   conduct from one another.  And plaintiffs have not suggested or

22   provided the court with any reason to believe that these and

23   other disparities would not exist between most or all members of

24   the putative class, which plaintiffs contend consists of over one

25   hundred individuals.  (See Mot. at 11; Reply at 2-3.)

26          Thus, even if the alleged policies were established on

27   a class-wide basis, to determine the existence of municipal

28   liability based on those policies the court would in effect be

1   required to conduct a "mini-trial" for each class member

2   evaluating complex and fact-intensive issues of causation and

3   injury based on the fourteen constitutional, statutory, and

4   common law claims that form asserted bases for municipal

5   liability.  (See FAC at ¶¶ 194-296); Patel v. Facebook, Inc., 932

6   F.3d 1264, 1275-76 (9th Cir. 2019) (acknowledging that need for

7   numerous "mini-trials" on individual issues may defeat

8   predominance); United Steel, Paper & Forestry, Rubber, Mfg.

9   Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC

10  v. ConocoPhillips Co., 593 F.3d 802, 809 (9th Cir. 2010) (same)

11  (citation omitted).[3]

12          Because the "non-common, aggregation-defeating,

13  individual issues" inherent in plaintiffs' municipal claims are

14  therefore "more prevalent . . . than the common, aggregation-

15  enabling issues" in the case, the court concludes that, were it

16  to certify the proposed class, these "individual questions

17  [would] overwhelm questions common to the class." Senne, 934

18  F.3d at 927, 938 (citations and internal quotation marks

19  omitted).  Plaintiffs have therefore failed to show "that the

20  _____

21          [3]     Moreover, the class proposed by plaintiffs is defined
    to include not only individuals shot with less-lethal weapons by

22  Sacramento police officers, but also those shot with such weapons
    by "mutual aid partners" from jurisdictions other than the City.

23  (See Mot. at 10.)  The policies plaintiffs identify, however, are
    City policies, which would be inapplicable to officers from other

24  jurisdictions unless those jurisdictions maintain identical
    policies, which plaintiffs have not alleged is the case.  This

25  introduces additional individualized considerations, since to
    determine municipal liability based on a given class member's

26  injuries the court would need to determine that the shooting
    officer was in fact a Sacramento police officer and not a mutual

27  aid partner bound by another jurisdiction's policies.

28

1  questions of law or fact common to class members predominate over

2  any questions affecting only individual members." Fed. R. Civ.

3  P. 23(b)(3). The court will therefore deny plaintiffs' motion

4  for class certification.[4]

5          IT IS THEREFORE ORDERED that plaintiffs' Motion for

6  Class Certification (Docket No. 13-1) be, and the same hereby is,

7  DENIED.

8  Dated: July 14, 2022

    WILLIAM B. SHUBB

9      UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27        [4]     Because the predominance inquiry is dispositive, the court does not consider the other relevant factors under Rule

28  23(a) and Rule 23(b)(3).

15